### Richmond

## COMMONWEALTH BANK AND TRUST COMPANY OF VIRGINIA
### v.
## INDEPENDENT BANK AND TRUST COMPANY, ET AL.

April 20, 1979.

Record No. 781445.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Robert C. Fitzgerald (John F. Carlton, Jr.; Fitzgerald and Smith, P.C.,* on brief), for appellant.

*James M. Thomson (Charles E. Pikrallidas; Thomson, Pikrallidas & Schott,* on brief), for appellees.

HARRISON, J., delivered the opinion of the Court.

The State Corporation Commission, by its order dated June 23, 1978, granted Independent Bank and Trust Company of Virginia a certificate of authority to begin business in Loudoun County, Virginia. Commissioner Shannon dissented. Independent's application for the certificate was opposed by Commonwealth Bank and Trust Company of Virginia, and this protestant bank is here upon an appeal of right.

Commonwealth, in its six assignments of error, contends that there is not sufficient evidence to support a finding under Virginia Code § 6.1-13(4) that "the public interest" will be served by another banking facility in Loudoun. Additionally, Commonwealth questions the Commission's findings, required by Code §§ 6.1-13(2), (5), (6), that financially responsible individuals have subscribed for the stock of the proposed bank; that Independent was formed for no other reason than a legitimate banking business; and that the moral fitness, financial responsibility and business qualifications of Independent's officers and directors are such as to command public confidence.

Independent was incorporated on May 24, 1977. Its paid-in capital will be $1.5 million, of which $1 million will be credited to capital stock, $250,000 to surplus, and $250,000 to reserve for operations. The bank will be located in the central commercial area of Sterling Park, a planned residential community with an estimated population of 13,000. Independent's primary service area, containing an estimated population of 20,000, is bounded on the north by the Potomac River; on the east by the Loudoun-Fairfax border; on the south by the property line of the Dulles Airport; and on the west by Highway 28. Currently located in this service area are five banking institutions with six offices, which are: Commonwealth Bank and Trust Company of Virginia; Peoples National Bank of Leesburg at the Town of Sterling; First Virginia Bank-First National in the mall at Sterling Park; Peoples National Bank of Leesburg in Sugarland Run; Bank of Virginia-Loudoun at Herndon Junction; and a branch of Fidelity American Bank of Fairfax. In addition, the area has an office of the Northern Virginia Savings and Loan Association and an office of the Newgate Savings and Loan Association. The primary service areas of each of the existing banking institutions overlap to some extent the proposed service area of Independent.

Loudoun County is served by nine banks with 22 banking offices in addition to five savings and loan offices. These facilities serve

the county's population of approximately 50,000, an increase from 24,549 in 1960 and from 37,150 in 1970. Independent's expert witness, David Parcell, Vice-President of Technical Associates, an economic and regulatory consulting firm, stressed this population growth of Loudoun. The majority opinion described as remarkable the growth in the eastern portion of the county near Dulles, where Sterling Park is located, and noted the 51.3% increase in population from 1960 to 1970 and the projected population of Loudoun of 50,000 in 1976. It commented on Loudoun's 137% increase in median family income during the 1960's and said the trend was projected to continue. It said that the per household average effective buying income in Loudoun had increased from $8,880 to $17,881 between 1970 and 1976, and that there was a 54% increase in the county's rate of new housing construction between 1960 and 1970. Also noted in the opinion was the 96% gain in Loudoun in retail sales between 1970 and 1976, and a growth of 117% in bank deposits during the same period. Savings and loan accounts had experienced a 585% increase in Loudoun since 1970. The Commission's majority found that the household deposit potential for Independent's primary trading area in 1976 was over $32 million and commented that this exceeded by two-thirds the total deposits held by the five banking offices in the area. It was estimated that this household deposit potential would be increased to over $50 million in 1981, and thereby the Commission concluded that "the existing as well as the projected deposits are ample to support a new bank here. A new bank need only acquire 15 percent of the existing potential deposits or 10 percent of the projected 1981 deposits to assure its profitable operation".

Independent introduced evidence regarding the composition of Sterling Park, the rapidity of its growth and development, and its projected growth. There was testimony of the various concentrations of businesses in the area, the existence of prime industrial sites, the adequacy of the water and sewerage systems and of the educational facilities. Also noted was the anticipated construction of the Windmill Mall in 1981, which Independent claims will give employment to an estimated 14,000 persons and will generate an estimated $50 million in retail sales. Independent pointed out that Sterling Park is also the location of a Loudoun County government office complex and that Ford Motor Company plans to construct a facility near Herndon Junction. It concedes, however, that "[i]t is the potential customer in Sterling Park that Independent seeks to attract".

The Commission compared the economic growth factors in Loudoun County with those of the Northern Virginia portion of the Washington, D. C. Standard Metropolitan Statistical Area. This portion consists of the counties of Arlington, Fairfax, Loudoun and Prince William, the cities of Alexandria, Fairfax, Falls Church and Manassas, and the town of Manassas Park. The percentage increase of growth in Loudoun in retail sales, bank deposits, income and housing starts is much greater than that of the entire metropolitan area. However, appellant argues that several of the areas in Northern Virginia have nearly reached their maximum growth level. It says the metropolitan sprawl has more recently reached Loudoun County, and this accounts for the high economic growth in Loudoun, as compared to the rest of the area.

The Commission's economist, Nicholas C. Kyriakides, reported to the Commission that "[i]t can be safely concluded that the level of economic development in Loudoun County is just about the same as the State of Virginia". Mr. Kyriakides' report, made at the request of the Commission, followed his investigation of Independent's application. This report is adverse to Independent's case. Besides finding the county's economic development to be only on par with the state average, the report found: that Loudoun County is well banked with no apparent need for more banks in the county; that the county has a relatively larger number of banks than Virginia, compared with respective population figures, i.e., in 1976, each bank in the county was serving on the average 5,535 persons, compared with 17,595 in Virginia; that since 1971 three new state banks have been established in the county, two of which are located within the trade area of Independent; and that competition has curbed the growth of banks and banking offices in the county, such that as of June 30, 1976, seven of the nine banks in Loudoun County had combined deposits below $20 million. Kyriakides concluded that another bank would introduce more inefficiency and weaken the county's banking system without much benefit to the banking public. He found Independent's projections of deposit and estimates of income and expenses to contain various inconsistencies, and found its estimate of the cost of the new building it proposes, as well as furniture, fixtures and equipment, to be extremely low.

Commonwealth is critical of the role played in this proceeding by Nick D. Turner, as he was Commonwealth's organizer and its former chief executive officer and board chairman. It argues that

Independent's application is not really "for the formation of a new banking business, but is rather an application for the attempted replacement of Commonwealth by Independent".

Founded in 1971, Commonwealth is located in Sterling in Loudoun County. From its origin the bank has not been profitable enough to declare a dividend. The evidence shows that at one time its loans to officers and directors reached 75% of its capital structure. The bank drew warnings from the State's Bureau of Banking on the manner in which it was conducting its affairs. Because of the serious problems which had developed, Commonwealth suffered gross losses of $850,000 and unrecoverable losses of $550,000. Its capital impairment was $270,000. This situation culminated in the dismissal of Turner by the bank's board of directors on April 6, 1977. Forty-eight days later, on May 24, 1977, Turner and several associates filed an application for the charter of Independent. It was testified that 24 of the 156 subscribers are Commonwealth shareholders; that these 24 shareholders have subscribed to 35,330 shares, or 35% of the entire capital stock of Independent; and that 67,320 shares of Independent, or 67%, have been subscribed to by customers of Commonwealth.

Alfred Wilson Powell, Jr., who replaced Turner at Commonwealth, attributed the large investment in Independent by Commonwealth's stockholders and customers to the influence exerted by Turner. Powell testified that Turner was "especially skilled at business development and public relations", had a large number of acquaintances and had access to information about the customers and shareholders of Commonwealth.[1]

It was testified on behalf of Commonwealth that the opening of Independent would not only have an adverse impact on all the banks in Loudoun County, but particularly on Commonwealth in view of the peculiar knowledge which the organizers of Indepen-

[1] Following Commonwealth's organization, and while an officer and director, Turner helped organize the Stonewall Jackson Bank in Mount Jackson, Virginia, from which he was subsequently asked to resign as a director. Turner also attempted to organize a national bank in the community of St. Charles in Charles County, Maryland in 1972. He testified that this application was subsequently withdrawn. Commonwealth showed that the application was not withdrawn but denied. Additionally, Turner was described as a vice-president and "number two man" of the Citizens National Bank of Southern Maryland at the time the Citizens Bank and Trust Company of Virginia, Sterling, Loudoun County, was approved, with Turner as president and chief executive officer. It was also represented that Turner had served three years as Assistant Vice-President with Fidelity National Bank, Arlington, Virginia, and two years with the First National Bank of Vienna, Virginia.

dent have of Commonwealth's structure, and the number of Commonwealth's stockholders and customers who have subscribed to stock in Independent. Richard D. Ketterman, a director of Commonwealth, estimated that if Independent is established, Commonwealth "will drop two to three millions dollars in deposits immediately". He said this loss would follow a recent two-year decline in deposits of about $2 million, which he attributed partly "to this conflict we've been having".

The Commission granted Independent a certificate of authority to begin business in Loudoun notwithstanding an adverse recommendation by its Bureau of Banking and by its economic advisor. Commissioner Shannon dissented because he concluded from the evidence that: (1) The public interest would not be served by a new banking facility in Loudoun County; (2) The Commission failed to determine that the subscribers to the stock are "financially responsible individuals" as it is required to do by Code § 6.1-13(2); (3) There may be some question whether Independent's stock is actually subscribed in view of Turner's testimony that no subscriber would be forced to accept or pay for the stock subscribed, and that a future distribution of the stock was to be made; (4) It was not satisfactorily shown that the bank was being formed "for no other reason than a legitimate banking business" as Code § 6.1-13(5) requires. Commissioner Shannon seriously questioned the motivation behind Independent's application, as well as "the moral fitness, financial responsibility and business qualifications" (which the Commission is required to ascertain under § 6.1-13(6)) of Independent's officers and directors.[2] Shannon, analyzing the status of the banking institutions in the area to be served by Independent, commented that none has achieved any great degree of success. In fact, Kyriakides reported that on June 30, 1976, the deposits of the five banks located in the trading area Independent seeks to serve amounted to only $19,321,000. The dissenting Commissioner expressed the view that "existing banks should certainly be allowed a reasonable opportunity to achieve a satisfactory level of performance before more competing banks are authorized".

A survey of recent cases involving the opening of new banks or savings and loan associations reveals no factual parallel to the

[2]The Bureau of Banking was unwilling to say to the Commission "that they [the directors of Independent] meet the statutory qualifications". Commissioner Bradshaw commented, "Well, I think it is the first case I've heard since I've been here where the fitness was not in some way recommended in the Bureau's report."

instant case. In *Covington Bank* v. *State Bank* 219 Va. 566, 249 S.E.2d 163 (1978), a ground swell of local support demanding a new bank existed. There 680 individuals oversubscribed the capital stock, and no single individual bought more than 2,000 shares. 75% of the subscribers lived within the primary or secondary trading area of the proposed Covington bank. Here, 16 of Independent's stockholders subscribed to 60.38% of its stock.

In *Old Dominion* v. *Colony Savings* 219 Va. 586, 249 S.E.2d 167 (1978), Old Dominion's application to establish a new branch was denied because it failed to show a sufficient number of people desired or would use the savings and loan service, that adequate service was not already being provided, or that there was any unsatisfied demand for mortgage money. We find in the record before us no evidence of any unsatisfied demand for loan money.

In *Grundy Bk.* v. *Miner's and Mer. Bk.*, 214 Va. 732, 204 S.E.2d 277 (1974), there was shown a need for a bank which would provide credit and service which the people of the area were demanding but not getting from existing banking institutions. In the case under review no complaint has been voiced about existing banks or the service they are providing Loudoun County.

In *Farmers and Merchants* v. *Commonwealth*, 213 Va. 401, 192 S.E.2d 744 (1972), we approved the opening of a branch office in Winchester of the Virginia Savings and Loan Association. There it was shown that the only savings and loan association in the area had increased its assets between 1960 and 1971 from $649,000 to $24,500,000. The Commission found, and we agreed, that because of the undeniably healthy financial and economic growth of the Winchester area, there was a public need for another savings and loan office. No one contended there that the financial soundness of any existing institution in Winchester would be jeopardized. Here Commonwealth has voiced the apprehension that its financial soundness would be jeopardized.

*Security Bank* v. *Schoolfield Bank*, 208 Va. 458, 158 S.E.2d 743 (1968), involved an application by Schoolfield to establish a branch in downtown Danville. The protestants conceded the inadequacy of Schoolfield's existing facilities and its need for additional facilities, but objected to the establishment of a branch on a downtown site. The evidence showed that the financial stability of other banks and other financial institutions in Danville would not

be jeopardized by the establishment of Schoolfield's branch, and it was allowed.

In *Second Nat'l v. New Bank of Culpeper,* 215 Va. 132, 210 S.E 2d 136 (1974), a public need was shown for an additional banking facility in the Culpeper community. The area was being served by two national banks which had enjoyed substantial growth and deposit increases. The Commission concluded that the establishment of a new bank would stimulate the economy of the area and competition among existing banks without jeopardizing the financial soundness of existing banks. Further, the evidence showed the existing banks in Culpeper were organized more than 70 years ago. Independent seeks to open a bank in an area that has seen three new banks open within the past eight years and in a county that since 1964 has had seven banks established, all of which are located 3.6 miles or less from the proposed location of Independent.

According the action of the Commission the presumption of correctness to which it is entitled, we nevertheless conclude that the evidence is insufficient to support its finding that the public interest will be served by granting Independent a certificate of authority to begin business in Loudoun County. The testimony given, and the reports and exhibits filed, make it abundantly clear that Loudoun County and its Sterling Park area are being adequately served by existing banks. There was no need shown for a new bank and there was no substantial interest manifested by the residents of the area for such a facility.

We cannot overlook the relatively low level of bank deposits in the county. Neither the record of the three banks which have opened since 1971, nor that of the five banks in the Sterling Park area, has been impressive. Even assuming the most optimistic projection of population growth, economic development and increase in bank deposits made by Independent's witnesses, the per capita bank deposits in the county, and in Independent's primary trading area, will not justify the establishment of another bank in the area.

The organization of any new bank in a community inevitably has some effect on the existing financial institutions. The effect is not necessarily adverse. The opposite is often the case. Seldom are

existing banks placed in financial jeopardy.[3] Each case must necessarily depend upon the facts and circumstances existing in a particular county, city or community. In the case under review the circumstances can be described as without parallel in our decided cases. We find the conclusion inescapable that the organization of Independent stems from and has its genesis in the power struggle that occurred in Commonwealth and in Mr. Turner's discharge as a director and as chairman of the board of the bank. We need only look to the short time that elapsed between Turner's discharge and the filing by Independent of an application for a charter; to the large percentage of Independent stock subscribed to by Commonwealth shareholders (35%) and customers (67%); to the decline in deposits in Commonwealth following Turner's discharge and the anticipated additional decline expected to occur if Independent is permitted to open for business; and to testimony reflecting dissatisfaction over Turner's dismissal and his replacement at Commonwealth by Powell. Dissatisfaction over a change in the management of an existing bank does not alone afford a valid reason for the organization of a new bank. This is especially true when there is no evidence of incompetency on the part of the new management.

We decide, based upon relevant evidence, that the establishment of the Independent bank will not be in the public interest of Loudoun County, or the Sterling Park area which Independent seeks to serve. In addition to evidence showing that the area is presently served by adequate banking facilities, and that a new bank would provide little additional convenience or gains in efficiency, we further find that the increased competition which would follow the opening of Independent would have an adverse effect on all banks in the area. This is particularly true of Commonwealth in view of the large number of its shareholders and customers who have subscribed to stock in Independent, and because of the former relationship which existed between Commonwealth and some of the organizers of Independent.

The order of the Commission granting a certificate of authority to begin business to Independent Bank and Trust Company of Virginia is reversed, and the proceeding is dismissed.

*Reversed and dismissed.*

---

[3] *See Ser. Nat. Bk. v. B. & H. Bk.*, 219 Va. 1031, 254 S.E.2d 77 (1979), for a discussion concerning jeopardy to the financial soundness of existing institutions.